**IN THE UNITED STATES DISTRICT COURT**

**FOR THE SOUTHERN DISTRICT OF IOWA**

**DAVENPORT DIVISION**

RECEIVED

MAY 1 5 2012

CLERK U.S. DISTRICT COURT
SOUTHERN DISTRICT OF IOWA

| | |
|---|---|
| Roberta Golliher, <br><br> Plaintiff, <br><br><br> vs. <br><br><br> University of Iowa, <br><br> Defendant. | Case No. 3:12-cv-60 <br><br><br><br> **COMPLAINT** |

Plaintiff Roberta Enid Golliher (hereinafter referred to as "Plaintiff") comes before this Court,

bringing forth a complaint as follows:

### PARTIES, JURISDICTION AND VENUE

1. Plaintiff is an adult citizen of the United States, residing at 100 Ford Drive, #1, Somerset, KY

   42501. Phone number (319) 594-3133.

2. Defendant The University of Iowa (hereinafter "Defendant"), is an agency of the State of Iowa, located primarily in Johnson County, Iowa. The University is governed by the Board of Regents of the State of Iowa, incorporated under the laws of Iowa.

3. This action is brought pursuant to Section 504 of the Rehabilitation Act of 1973, codified at 29 U.S.C. § 701 et seq. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331.

4. This cause of action arose in Johnson County, Iowa. Venue in this Court is proper under 28 U.S. C. § 1391 (b).

### PROCEDURAL HISTORY

5. On December 10, 2009, when Plaintiff was terminated from her position as Graduate Assistant/Teaching Assistant by Defendant, Plaintiff complained of discriminatory conduct. A recording was made of this termination hearing with the knowledge of all parties. Defendant did not investigate this complaint.

6. On May 4, 2010, Plaintiff filed a written formal complaint to the Dean of Students regarding discriminatory conduct, which Defendant refused to investigate in writing on May 14, 2010.

7. On May 14, 2010 Plaintiff filed a written formal complaint to the Office of Equal Opportunity and Diversity regarding discriminatory conduct, with a resulting Statement of Findings on November 29, 2010, which included a refusal to investigate, and was a failure of prompt and equitable resolution.

8. On May 27, 2011, Plaintiff filed a complaint with the United States Department of Education's Office for Civil Rights ("OCR"), alleging that Defendant failed to provide a prompt and equitable resolution of a discrimination grievance.

9. On February 23, 2012, Defendant signed an "Agreement to Resolve" which would be fully implemented by June 17, 2014, requiring that Defendant will:

- Ensure that all complaints of sex or disability discrimination are resolved promptly, implement a system for tracking and reviewing Defendant's handling of complaints, and report by May 15, 2012 describing the tracking and review systems that have been implemented.

- Submit a report of a comprehensive review of Plaintiff's May 2010 complaint of discrimination by May 15, 2012.

- Submit a report of a comprehensive review of all other investigations conducted by Defendant during the 2010-2011 academic year, and the 2011-2012 academic year to date by May 15, 2012.

- Determine whether all investigations were in accordance with Defendant's procedures for discrimination complaints and report on the result by May 15, 2012.

- Determine whether there were delays in the procedures, whether they were justified delays, whether the parties were notified of the delays, and whether anyone was adversely affected by the delays and report on the result by May 15, 2012.

- Take corrective action of adverse affects, including re-investigation, modifications of findings, or other remedial measures and report on the corrective actions, when appropriate, by May 15, 2012.

- Submit a summary chart to the OCR of the review of all complaints by May 15, 2012.

- Revise their procedures to include timeframes for the filing of appeals and the appeal process and submit the proposed revised procedures to the OCR by April 30, 2012.

- Disseminate the revised procedures, making revisions to all University handbooks, other documents, and the University website by May 15, 2012, and report on their compliance by June 15, 2012.

- Make changes to staffing levels and work assignments within the University's discrimination office necessary to accomplish the goals of the agreement by April 30, 2012, and report on the changes by May 15, 2012.

- Provide comprehensive training to responsible staff and other University officials by July 31, 2012, and report on the training accomplished by August 15, 2012 including a copy of training materials, sign-in sheets for the training, and the names and qualifications of the persons who delivered the training.

- By June 17, 2013 submit a report of all discrimination complaints investigated by the Defendant in the 2012-2013 academic year, including the date of the complaint, a summary of the allegations, and the date of the findings.

- By June 17, 2014 submit a report of all discrimination complaints investigated by the Defendant in the 2013-2014 academic year, including the date of the complaint, a summary of the allegations, and the date of the findings.

- Submit to other requests as deemed necessary by the OCR.

## PRELIMINARY STATEMENT

Plaintiff charges Defendant with the following counts:

Count 1 Section 504 –Hostile Environment – Plaintiff's designation as an otherwise qualified disabled person.

Count 2 Section 504 –Hostile Environment – Termination of Plaintiff in teaching position due to perceived disability.

Count 3 Section 504 – Hostile Environment – Failure to provide prompt and equitable resolution of perceived disability discrimination grievance.

Count 4 – Section 504 – Hostile Environment – Defamation of Plaintiff as being a "seriously mentally impaired" person.

Count 5 – Title IX – Failure to provide prompt and equitable resolution of grievances of sex harassment, termination of student employment, and defamation.

Count 6 – Breach of Contract – Termination of Plaintiff's employment in violation of contract.

Count 7 – Breach of Contract – Failure to provide prompt and equitable resolution of grievances as according to Plaintiff's contract with the University.

Count 8 – Defamation – Defamation of Plaintiff as "seriously mentally impaired" person.

Count 9 – Fraud – Misrepresentation the Defendant would provide prompt and equitable resolution of discrimination grievances, and Plaintiff's detrimental reliance on the misrepresentation.


Plaintiff begs the Court's indulgence in reading this complaint. Elements necessary for certain charges may occur in the factual allegations of other charges. Plaintiff asks that they be treated as referenced in the appropriate charge.

5

Sometimes certain factual allegations support different charges, and instead of their being referenced subsequently by paragraph number in later charges, they may be repeated.

**COUNT 1 -** Section 504 – Hostile Environment – Plaintiff's designation as an otherwise qualified disabled person.

10.      Defendant is a recipient of federal funds.

11.      Plaintiff is a qualified individual as defined by the Act.

12.      In early 2001, Plaintiff applied for admission to the PhD program of the Department of Communication Studies in the University of Iowa.

13.      Defendant granted Plaintiff admission in the Fall of 2001 with the Presidential Graduate Fellowship.

14.      In December of 2006 Defendant granted Plaintiff the Master's degree.

15.      Plaintiff continued studies toward the PhD until Spring 2010.

16.      Plaintiff was deemed by the Defendant to have satisfied the requisite requirements to be admitted to the graduate program in the Department of Communication Studies.

17.      Plaintiff was deemed by the Defendant to have satisfied the requirements to be awarded the Master's Degree.

18.      Plaintiff passed the qualifying and and comprehensive exams for the Ph.D. program.

19.      Plaintiff was further deemed to have satisfied the requirements to continue studies toward completion of the Ph.D.

20.      Plaintiff remains a student in good standing at the Defendant's University.

21.     Plaintiff was deemed by the Defendant to have satisfied the requisite requirements of the employment position of Graduate Assistant/Teaching Assistant.

22.     Plaintiff was hired by Defendant to perform the essential functions of a Graduate Assistant/Teaching Assistant.

23.     As part of the program of study, Plaintiff taught a course in Intercultural Communications under the Graduate Assistantship/Teacher's Assistantship program, with sole responsibility for the course, under supervision of, first, Professor Kristine (Fitch) Munoz, and then Professor Joy Hayes.

24.     Plaintiff is a disabled person under Section 504 as a result of being falsely perceived as having a "serious mental impairment", and as a result of having a (false) record of impairment.

25.     Iowa Code, under which Plaintiff suffered discrimination, defines "serious mental impairment" thusly:

> *"Seriously mentally impaired"* or *"serious mental impairment"* describes the condition of a person with mental illness and because of that illness lacks sufficient judgment to make responsible decisions with respect to the person's hospitalization or treatment, and who because of that illness meets any of the following criteria:
>
> *a.* Is likely to physically injure the person's self or others if allowed to remain at liberty without treatment.
>
> *b.* Is likely to inflict serious emotional injury on members of the person's family or others who lack reasonable opportunity to avoid contact with the person with mental illness if the person with mental illness is allowed to remain at liberty without treatment.

c. Is unable to satisfy the person's needs for nourishment, clothing, essential medical

care, or shelter so that it is likely that the person will suffer physical injury, physical

debilitation, or death. (Iowa Code 229.1.17).

26.     An application for the involuntary commitment of Plaintiff can made on the basis of an

affidavit by an interested person, supported by two affidavits.

27.     Plaintiff was falsely perceived to be suffering from a mental impairment by a student of

Defendant's University, Brittany Hall, and a former student accomplice, Charles Eicher.

28.     On or about December 3, 2009 Hall and Eicher conspired together to make an

application at the Johnson County courthouse to have Plaintiff involuntarily committed to a

psychiatric hospital.

29.     In support of their application, the Hall and Eicher swore to false statements including

that Plaintiff was homeless, was refusing to bathe, was suffering from insomnia, had been

diagnosed previously with manic depression, and was previously hospitalized for manic

depression.

30.     With the application approved by the court, as in this case, a person in Plaintiff's

position can be transported involuntarily to a psychiatric hospital if a judge finds probable

cause to believe that the person has a serious mental impairment and is likely to injure

themselves or other persons if allowed to remain at liberty.

31.     On December 3, 2009 Plaintiff was involuntarily transported to the University of Iowa

hospital, and subjected to physical and psychological examination for a period of days.

32.     In order to facilitate her release, Plaintiff signed a HIPAA release so that the hospital

could communicate with Defendant through the course's supervising professor, Joy Hayes.

8

Defendant.

33.     Having learned of the involuntary hospitalization, and on the basis of a false perception that Plaintiff suffered from a mental impairment, Defendant terminated Plaintiff from her position as Teaching Assistant.

34.     Defendant terminated Plaintiff for no other reason.

35.     This termination, described as a breach of contract below, constitutes one of the adverse actions taken against Plaintiff in violation of Section 504.

36.     Later, in response to a formal grievance of the actions of the student and Defendant, Defendant created a record of impairment for Plaintiff, stating falsely in writing that a commitment hearing was held to determine whether she should be involuntarily committed to psychiatric treatment.

37.     A hearing is held upon a medical report that a person is seriously mentally impaired.

38.     In response to a second formal grievance of the actions, Defendant referred in writing to Plaintiff's "involuntary commitment" to a psychiatric hospital. This is detailed in Plaintiff's charges of defamation.

39.     The standard for being involuntary commitment is that it is a medical fact that a person has a serious mental impairment.

40.     Defendant therefore falsely perceived Plaintiff to be suffering from a serious mental impairment, and also created a record of this perception as if it were true, and then believed their own record.

9

41.     In actuality, on December 7, 2009 Plaintiff was released with a finding for no need for

treatment on an inpatient or outpatient basis, and no need for a hearing on the issue of

involuntary commitment.

42.     Plaintiff provided documentation to the Defendant of her release with no need for

treatment, yet Defendant treated Plaintiff as if Plaintiff were mentally impaired, and to treat

her in an adverse manner inconsistent with Section 504.

43.     At the hearing in which Plaintiff protested the termination, and in response to

subsequent grievances, Defendant proffered false reasons for the termination as a pretext for

discrimination, changing the reasons for different occasions, along with falsely writing that

Plaintiff had a commitment hearing and was involuntarily committed to a psychiatric hospital.

44.     Plaintiff, at the termination hearing, in a formal complaint to Defendant on May 4, and

in a formal complaint to Defendant on May 14 claimed that she was a victim of discrimination

on the basis of perceived disability.

45.     Defendant refused to provide prompt and equitable resolution of the grievance

complained of.

46.     Plaintiff has suffered damage to her academic career, employment opportunities in the

Defendant's University and elsewhere, and emotional injury.


**COUNT 2 -** Section 504 – Hostile Environment – Termination of Plaintiff in teaching position due

to perceived disability.

47.     Plaintiff and Defendant entered into a contract whereby Plaintiff, as a Graduate

Assistant (also known as a Teaching Assistant) taught a class for the Department of

Communication Studies, "Intercultural Communication", in the Fall of 2009.

48.     The contract was governed by a document resulting from collective bargaining called

the AGREEMENT BETWEEN BOARD OF REGENTS, STATE OF IOWA AND THE UNITED ELECTRICAL,

RADIO AND MACHINE WORKERS OF AMERICA, LOCAL 896/COGS (the "Agreement").

49.     Up until termination of Plaintiff's employment, Plaintiff had performed all conditions,

covenants, and promises required to be performed in accordance with the terms and

conditions of the contract.

50.     Defendant terminated Plaintiff's teaching assistantship in violation of the contract.

51.     On December 8, 2009 Defendant emailed Plaintiff's students that the class was

cancelled. Defendant did not inform Plaintiff.

52.     On December 10, at Defendant's request, Plaintiff met with Defendant, in the person of

Departmental Executive Officer ("DEO") John Peters, with Union Field Organizer Jennifer Marsh

present, whereupon Defendant terminated Plaintiff from the teaching position.

53.     With only one class meeting left, on Friday December 11, Defendant then cancelled the

class, cancelled the final examination, and cancelled the student's obligation to turn in a final

paper for the course.

54.     Defendant cited Article IV, Section One of the Agreement during the termination

meeting, saying that Defendant's termination of the Plaintiff was in exercise of the rights to "1.

Direct the work of its employees.; 4. Maintain the efficiency of University operations.; 6.

Determine and implement methods, means, assignments and personnel by which the

11

Employer's operations are to be conducted.; and 7. Take such actions as may be necessary to carry out the mission of the Employer."

55.     Plaintiff asked how cancelling the class and terminating her from her teaching position maintained the efficiency of University operations, and assisted in carrying out the mission of the University, and Defendant did not respond. Specifically:

Plaintiff: Again I will need to know in writing the reasons you believe that my fulfilling my duties as a Teaching Assistant with the responsibilities of a stand-alone course, by showing up to my course on Friday and by administering a final exam would anyway interfere with Number 4 maintaining the efficiency of University operations, and number 7, you would be taking such actions as may be necessary to carry out the mission of the Employer by dismissing me.

Defendant: We're asking you not to come to class because I believe we need to meet with the students and get things cleared up as to what their options are.

Plaintiff: I understand that these then are your grounds. I want to know the reason why in this instance why these grounds hold.

Defendant: Which grounds?

Plaintiff: How it is that if I were to finish teaching this course and not be dismissed I would in any way interfere with the efficiency of the University operations such that you find it necessary to dismiss me to maintain the efficiency of University operations. I would also like to know how it is that if I were to finish teaching this course, rather than being dimissed for this course, this would somehow interfere with the mission of the

employer. I think I would need this in writing. Are you willing to give me those in writing?

Defendant: At some point. I can't guarantee I would do it before 12:30 tomorrow.

56.     Defendant never provided the explanation to Plaintiff.

57.     According to Union Field Organizer Marsh, Defendant's action was a significant departure from the procedure understood in the interpretation of discipline in clause 3 of Article IV, Section One of the Agreement: "3. Suspend, discipline or discharge employees for proper cause." Specifically, Marsh observed:

Marsh: I'm just going to add as well that generally I believe we have progressive discipline in the cause agreement. And so that in order to facilitate the decision-making here I think we'd like to know what your grounds are for the discipline. And also if there is any past discipline, because generally the level of discipline has to correlate with the level of misconduct or poor performance or whatever the case may be. And it also needs to be a corrective process in that ideally there's a written warning or some sort of lesser discipline imposed in an attempt to correct the situation prior to termination. I understand there is one class left in the semester. But I'd like to point out in terms of, we would like to know in detail and in writing what the grounds are and if there is anything else that has been attempted prior in order to deal with the situation.

58.     No such written explanation was transmitted to Plaintiff.

59.     Defendant did not terminate Plaintiff for proper cause, but for the fact that she was perceived to suffer from a mental impairment.

60.     Plaintiff was involuntarily hospitalized in a psychiatric hospital from December 3 until December 7, and the termination occurred before the next remaining class session, after Plaintiff's return from the hospital.

61.     Defendant offered a false justification as the "essential" reason for terminating Plaintiff: an allegation, which later turned out to be without merit, and was subsequently abandoned by the University in their response to Plaintiff's formal grievance, that Plaintiff had violated the school's FERPA policy. Specifically:

>   Defendant: I want to clarify what the department's position is. One of the things which became clear to me on Tuesday was that there had been a systematic FERPA violation in your class. You're familiar with FERPA? The Buckley Amendment? Family Educational Rights? This is part of your contract. It's very clear. This is the binding rules from the college. It says students should never have access to the scores or grades of other students. I have a signed affidavit attached to another issue from a student who has been seen working on the grades of other students. You've had someone enrolled in the class who has been grading or helping you to grade the work of other students. This is a FERPA violation.

>   Plaintiff: I do contest that. I contest that I have a student who has graded material that has been recorded for the purpose of evaluating students. I have had a student who helped code an informational survey about individualism and collectivism. This is not a component of the course that I was intending to figure into the grades of the students in the course. It was a survey about values, quite neutral values. I can give you a copy of the survey.

> Defendant: So you are saying that this student never saw any other student's work.
>
> Plaintiff: No [she did not].

62.     Defendant's true reason for terminating Plaintiff was discrimination based on a false perception that Plaintiff was medically deemed to be a danger to the safety of herself and others.

63.     Defendant instructed Plaintiff not to show up to the class meeting, saying "I think I can also on grounds of number 4, I can ask you not to come to class tomorrow without initiating the suspension procedure."

64.     The instruction to not make a physical presence is not consistent with a proper cause related to an as-yet uninvestigated allegation that a student graded other students' work, but is consistent with an improper discriminatory reason.

65.     Defendant did not terminate Plaintiff as part of a disciplinary action for violating FERPA or any other school policy, but instead stated that she would be placed on "sick leave". Specifically:

> Plaintiff: Could you specify which complaints are leading to your action, and can you specify exactly what it is you are asking me to do. I don't know if I'm being fired, if I'm being suspended. I need the precise terms. I need to know what the grounds are contractually for what is happening to me. And I need to know the reasons that you perceive that these grounds have been met.
>
> Defendant: To be specific I would like to give you a choice between taking sick leave or being dismissed. If you are dismissed you would not receive your January paycheck. You

have a right in your contract, 13.5 days sick leave. We don't have to specify anything about the nature of the sickness. I'd be happy to sign off on that and we…

Plaintiff: I would like to know on record why you are offering me the choice of sick leave.

Defendant: Because I think it is more humane. You'll get paid.

Plaintiff: I would like to know on record, more specifically, why it is sick leave that you are offering me.

Defendant: I've talked with you on several—I've talked with you once — I've received email from you this semester in which you've talked about various illnesses that you've had.

Plaintiff: I would like you to specify which illnesses these are.

Defendant: As I said, by offering sick leave, I said I would not try to specify the illnesses. I know that you've had—I believe you've—I would have to check with the email but you've had the flu. I know you've been stressed. I don't think there's any debate about that.

Plaintiff: I would like to state for the record that it has been relevant to one 15 minute period of time that was covered for 10 minutes of that period by an officemate of mine, that I am indeed a chronic sufferer of migraine.

Defendant: Okay.

Plaintiff: I would like to reiterate what I said in my email, that I am ready willing and able to teach this course.

Defendant: I appreciate that.

Plaintiff: And I would also like to emphasize to you what I emphasized to Joy, I have just been through a battery of psychological exams. And on the grounds of those exams, not only have I just been released from the hospital but the hearing at which a judge might weigh in was cancelled by the psychiatrist.

Defendant: Okay.

Plaintiff: And, I would like to go on record now with asking if I may consult with an attorney before making this choice. It is my immediate inclination to choose dismissal over sick leave. I need to know what the legal implications are.

Marsh: So, from the standpoint of the assistantship, I think we understand the situation as you are offering, if Roberta would like, she can take sick leave. Otherwise her assistantship will be terminated.

Defendant: Right. She won't meet with the class tomorrow.

Plaintiff: I would also like to go on record that the swine flu that I experienced, I have been over for some time. There are medical records with Student Health that I could consult to get the exact date and time of my treatment for swine flu.

66.     Defendant falsified a "proper cause" in terms of terminating Plaintiff for having previously suffered from swine flu and a migraine, and proffered another false "proper cause" of a student grading papers, but actually terminated Plaintiff for an improper cause of discrimination unlawful under Section 504 of the Rehabilitation Act of 1973, contrary to public policy.

67.   In terminating Plaintiff, Defendant stated that "the action was not disciplinary and that there would be no record as such in her teaching folder," according to Defendant's statement of Findings of November 29, 2010. Defendant therefore did not provide Plaintiff with any means to rehabilitate her position, or to take any corrective action in the future.

68.   Plaintiff suffered non-monetary damages, in the loss of the intangible benefits of the Teaching Assistantship, such as:

1.   The detriment of reputation, which was tarnished among the University administration, faculty, and students.

2.   The loss of the availability of letters of reference regarding the completion of the course.

3.   The loss of the ability to include the course on a resume.

4.   The loss of the availability of other offers to be a Teaching Assistant, due to unwillingness on the part of professors to hire someone perceived to be terminated for proper cause, or for mental impairment.

5.   Other damage.

69.   Plaintiff has suffered damage to her academic career, employment opportunities in the Defendant's University and elsewhere, and emotional injury.

**COUNT 3 -** Section 504 – Hostile Environment – Failure to provide prompt and equitable resolution of perceived disability discrimination grievance.

70.   Plaintiff made a complaint to Defendant under the appropriate procedures, about disability-based, student-student harassment Plaintiff had experienced.

71.     The complaint was that a student, Brittany Hall, had harassed Plaintiff, on the basis of a perceived disability, by making false statements in an affidavit supporting an application to a court, to the local sheriff, and to local police, to request an order for Plaintiff to be committed involuntarily to a psychiatric hospital.

72.     Plaintiff complained to Defendant that it was falsely claimed by Ms. Hall and an accomplice that Plaintiff was diagnosed with manic depression, was previously hospitalized with manic depression, was homeless, was going off medication, and was refusing to bathe.

73.     As a result, Plaintiff was removed from her residence by a sheriff's deputy and a Coralville police officer, and brought involuntarily to a psychiatric hospital where she was subjected to physical and psychiatric examinations.

74.     That the statements were false is supported by the outcome of the procedure. After a legally stipulated evaluation phase that lasted four days, which also included a review of Plaintiff's hospital and student health records, a court-scheduled commitment hearing was cancelled upon the recommendation of court-appointed psychiatrists, the hospital released Plaintiff . No treatment was ordered, and the application was dismissed in accordance with Iowa Code section 229.10:

    229.10  3. If the report of the court-designated physician or physicians is to the effect that the individual is not seriously mentally impaired, the court may without taking further action terminate the proceeding and dismiss the application on its own motion and without notice.

75.     Plaintiff was not, and never has been, diagnosed or treated for manic depression.

19

76.    That the original court order was based on false information is also circumstantially
supported by the fact that Defendant has not produced any independent evidence that Plaintiff
was diagnosed with manic depression, was previously hospitalized with manic depression, was
homeless, was going off medication, or was refusing to bathe.

77.    The complaint was raised verbally when Plaintiff was terminated from her position as
Graduate Assistant/Teaching Assistant, on December 10, 2009, upon release from the
psychiatric hospital.

78.    The complaint was also made in writing, formally, to the Defendant's Dean of Students,
Dean Baker, on May 4, 2010.

79.    The complaint was also made in writing, formally, to the Defendant's Office of Equal
Opportunity and Diversity on May 14, 2010.

80.    The particulars of the complaint fell under the Defendant's Harassment policy.

81.    Defendant's harassment policy is liberally construed, i.e., "The purpose of this policy is
to prevent harassment within The University of Iowa community and to provide a process for
addressing all forms of harassment if and when it does occur." (The University of Iowa
Operations Manual, Part II, Chapter 14, 14.1).

82.    Defendant's harassment policy specifically addresses the form of harassment Plaintiff
was subjected to in their Operations Manual, as stated:

   **14.2 POLICY.**

   Harassment of any member of the University community is prohibited.

a. Definition of harassment as it relates to conduct. "Harassment" means intentional conduct directed toward an identifiable person or persons that is sufficiently severe, pervasive, or persistent that it interferes with work, educational performance, on-campus living, or participation in a University activity on or off campus.

...

c. Evidence of harassment. Behavior that may constitute, or be evidence of, prohibited harassment includes, but is not limited to, the following:

...

(3) harassment proscribed by the Iowa Criminal Code, Chapter 708, including, for example, stalking, the placement of simulated explosives, ordering merchandise or services with intent to annoy, *or false reports to police.*

(Emphasis added, The University of Iowa Operations Manual, Part II, Chapter 14, 14.2)

83.    Defendant's Harassment Policy applies to conduct "at any location", provided that:

(d) The conduct has the purpose or reasonably foreseeable effect of substantially interfering with the work or educational performance of UI students, faculty, or staff;

(The University of Iowa Operations Manual, Part II, Chapter 14, 14.3(2))

84.    Getting a student locked up when classes are on, and creating a situation in which Plaintiff's supervisors believe she is dangerous, meets both of these criteria, especially when it results in the Plaintiff being terminated.

85.    Even though Plaintiff brought forth a complaint pursuant to policy, Defendant refused to even investigate this complaint, let alone actually provide Plaintiff with a redress.

21

86.     In so doing, Defendant exacerbated the negative conditions that Plaintiff was operating

under as a Graduate student, by, in writing, falsifying a new, more serious claim that Plaintiff

was subject to a commitment hearing, and was committed to a psychiatric hospital, a falsehood

easily disproved.

87.     As is common knowledge, Defendant's writing, which was published by Defendant

throughout their University, implies not only that a judge had probable cause to believe that

Defendant had suffered from a serious (i.e., dangerous) mental impairment, but that Plaintiff

was indeed determined to require a hearing.

88.     A hearing occurs in Iowa upon the finding of one of the following three conditions:

*b.* That the respondent is seriously mentally impaired and in need of full-time custody,

care and inpatient treatment in a hospital, and is considered likely to benefit from

treatment.  The report shall include the chief medical officer's recommendation for

further treatment.

*c.* That the respondent is seriously mentally impaired and in need of treatment, but

does not require full-time hospitalization. If the report so states, it shall include the chief

medical officer's recommendation for treatment of the respondent on an outpatient or

other appropriate basis.

*d.* The respondent is seriously mentally impaired and in need of full-time custody and

care, but is unlikely to benefit from further inpatient treatment in a hospital.  The report

shall include the chief medical officer's recommendation for an appropriate alternative

placement for the respondent.

(Iowa Code 229.14.1)

89.     Defendant published the following, in response to Plaintiff's complaint, on May 14,

2010:

> "Your second allegation asserts that Ms. Hall misrepresented the truth to the
>
> hospitalization referee during your committal hearing in December, 2009. Your
>
> complaint also accuses Charles Eicher of providing false information and harassing you.
>
> Because the committal process is a civil process and not a University process, the Office
>
> of the Dean of Students does not intend to investigate what did or did not occur during
>
> the committal hearing. Rule 2 of the Code of Student Life does not apply to non-
>
> University civil procedures."

90.     As an aside, disseminating with malice such a defamatory writing that the Plaintiff is one

of the above three types of person is so defamatory as to make conditions intolerable to

continue participation in Defendant's program, and is not just a refusal to investigate a valid

grievance of perceived disability discrimination.

91.     Note that, however, Defendant is operating under a Harassment policy that explicitly

states that the Code of Student Life, Rule 2, is not a "limiting", but a "such as" document, when

it comes to complaints against students:

> (1) Complaints that a student violated the rights of any member of the University
>
> community may be investigated under a process initiated by the Dean of Students (such
>
> as, but not limited to, the *Code of Student Life*;
>
> (Emphasis in original. The University of Iowa Operations Manual, Part II, Chapter 14,
>
> 14.4(a)(1))

92.     Note also that Rule 2 of the Code of Student Life does use the phrase "anyone inside or outside the University" twice when discussing the recipients of false statements:

> Willful misrepresentation of any material fact to a University of Iowa office, instructor, department, or committee; willful representation to anyone inside or outside the University regarding any material fact relevant to a University educational program or activity; (The University of Iowa Code of Student Life, Rule 2)

93.     Defendant has gone out of their way, misconstruing and abrogating their policies in order to avoid redressing Plaintiff's grievance, but still presents refusing to investigate as a choice.

94.     In response to Plaintiff's second formal written complaint, on May 14 2010, to the Office of Equal Opportunity and Diversity, on November 29, 2010, Defendant wrote, and disseminated widely in the University, to Plaintiff's professors, and to several administrators, the following:

> "Ms. Golliher alleges that Professor Munoz may have played a role in her being involuntarily committed to a psychiatric hospital. Since the committal process is a civil process and not a University process that is within the purview of EOD, EOD did not investigate this allegation."

95.     Defendant did not include in this writing that Plaintiff was released after evaluation, with no need for a hearing, or treatment, and never was committed.

96.     Defendant wrote that Plaintiff was involuntarily committed.

97.     Again, disseminating with malice such a defamatory writing that the Plaintiff is one of the above three types of person (all seriously mentally impaired) is so defamatory as to make

conditions intolerable for Plaintiff to continue participation in Defendant's program, and is not just a refusal to investigate. It is a continuation of intolerable discriminatory conditions.

98.     Defendant did not avoid the possibility of a misunderstanding on the part of a reader that being "committed" to a psychiatric hospital, along with a hearing, meant that Plaintiff was indeed recommended for involuntary treatment in a psychiatric hospital, that she was found in a hearing to be one of the three categories of seriously mentally impaired person, an even crueler slander than that grieved of (i.e., involuntary hospitalization due to true probable cause).

99.     Defendant has gone above and beyond merely refusing to investigate and resolve a complaint of discrimination based on perceived disability, but has created, exacerbated, and disseminated more discrimination and has persisted to the date of this filing in refusing to reverse their actions.

100.    In conclusion, Plaintiff will give an example. Although requested to do so, Defendant has persistently refused to inform its employees that they must erase or destroy all records that refer to Plaintiff as a person regarding whom a hearing had been held to consider treatment, voluntary or involuntary, at a psychiatric hospital, and/or to her as having indeed been involuntarily committed.

101.    Defendant has refused to inform its employees that they must not in the future refer to Plaintiff as a person regarding whom a hearing had been held to consider treatment, voluntary or involuntary at a psychiatric hospital and/or to her indeed having been involuntarily committed.

102.    Not only are these refusals unnecessary for the Defendant to carry out its educational

mission, but they also create an intolerably hostile environment, leading towards Plaintiff's

withdrawal from full participation in the Ph.D. program.

103.    Due to the intolerable discriminatory conditions created by Defendant, Plaintiff has

suffered damage to her academic career, employment opportunities in the Defendant's

University and elsewhere, and emotional injury.


**COUNT 4** – Section 504 – Hostile Environment – Defamation of Plaintiff as being a "seriously

mentally impaired" person.

104.    Defendant, in the person of David L. Grady, Associate Vice President for Student

Services and Dean of Students, published the following on May 14, 2010: "Your second

allegation asserts that Ms. Hall misrepresented the truth to the hospitalization referee during

your committal hearing in December, 2009." and "Because the committal process is a civil

process and not a University process, the Office of the Dean of Students does not intend to

investigate what did or did not occur during the committal hearing."

105.    This was published to Tiffini A Stevenson Earl, Senior Compliance Specialist and ADA

Coordinator, Office of Equal Opportunity and Diversity, and Valerie A. Heffernan of the Office of

the Vice President for Student Services. It was re-published again to others in writing and

verbally.

106.    The published sentence presuppose the truth, by subordinating in a noun phrase, of a

proposition that Plaintiff had a hearing in a psychiatric hospital to determine whether Plaintiff

should be involuntarily committed to a psychiatric hospital.

107.    In truth, after being evaluated involuntarily, Plaintiff was never deemed to have

required a commitment hearing to be held. No hearing occurred. The statement was false.

108.    Plaintiff never alleged that anyone, "misrepresented the truth to the hospitalization

referee during [Plaintiff's] committal hearing". Plaintiff never alleged that there was such a

hearing.

109.    Instead, Plaintiff, in her formal complaint to Defendant on May 3, 2010, alleged the

following:

> "Specifically, [Ms. Hall] made false and exaggerated claims about me in a statement
>
> alleging me to be seriously mentally impaired, claims to which she swore and
>
> affirmed December 3, 2009 at Johnson County Courthouse, which resulted in my
>
> being involuntarily hospitalized, unnecessarily and at great expense to both myself,
>
> the hospital, and the county. (Though the hearing regarding whether I should be
>
> involuntarily committed would be eventually be canceled Dec. 7 at the hospital
>
> psychiatrists' advice, a great deal of damage had already been done me by the
>
> initial involuntary hospitalization.) Details of the false nature of her claims are
>
> appended to the end of this email (in Appendix A).
>
> ...
>
> Appendix A, regarding the false and exaggerated statement Ms. Hall filed with
>
> Johnson County: Ms. Hall's statement erroneously alleged that I was seriously
>
> mentally impaired, resulting in an unnecessary, damaging, and very expensive
>
> involuntary hospitalization. Her statement included a variety of blatant falsehoods,
>
> ranging from a claim that I was homeless, when I was not (though homelessness

27

would not have been grounds for a hospitalization at any rate), and that I was

refusing to bathe, which I was also untrue, to an entirely spurious claim that I had

stopped taking migraine medication, leading to insomnia. The migraine medication

I was then and am currently prescribed I take upon getting a headache, not daily. It

is not a medication that is prescribed for insomnia, nor was I insomniac at the time

Ms. Hall alleged me to be."

110.    Staff of Defendant, in supervisory capacity, circulated defamatory rumors in writing and

in speech about Plaintiff that there was a commitment hearing, at which a person called a

"hospitalization referee" (sic) existed, such that Defendant in the person of Mr. Grady

published this defamatory statement. That is, the purported existence of a referee and a

hearing came from a source other than Plaintiff. These as-yet-undiscovered defamatory

statements are included in this action against Defendant.

111.    Defendant thereby turned false statements to the sheriff by Ms. Hall about Plaintiff's

ability to care for herself into a published statement presupposing a civil commitment process

which never occurred.

112.    Defendant did not investigate the truth of Defendant's statement before defaming the

Plaintiff, even though records were available, and Plaintiff was in a dispute regarding the

matter.

113.    Defendant has never made an attempt to correct the aforementioned false statement,

even though Plaintiff has continued to protest both informally and formally, inside and outside

of the University.

114.     In response to Plaintiff's second formal complaint in the University, dated May 14, 2010, Defendant, in the person of Tiffini A Stevenson Earl, published the following on November 29, 2010: "Ms. Golliher alleges that Professor Munoz may have played a role in her being involuntarily committed to a psychiatric hospital. Since the committal process is a civil process and not a University process that is within the purview of EOD, EOD did not investigate this allegation." This was the sole discussion of the matter in Defendant's writing.

115.     This was published to Professors in Plaintiff's department, Joy Hayes, John Peters, and Kristine Munoz. These were not only professors in Plaintiff's department, but had supervisory responsibilities over Plaintiff. It was re-published again to others in writing and verbally.

116.     This was also published to Georgina Dodge, Chief Diversity Officer and Associate Vice President, Jennifer Modestou, Director, Office of Equal Opportunity and Diversity, Tom Rice, Associate Provost for Faculty, Linda Maxson, Dean, College of Liberal Arts & Sciences, Raul Curto, Executive Associate Dean, College of Liberal Arts & Sciences, and Nancy Fick, Senior Human Resources Representative, College of Liberal Arts & Sciences.

117.     Plaintiff never alleged that she was involuntarily (or voluntarily) committed to a psychiatric hospital.

118.     Plaintiff never alleged that a hearing was held to have her committed to a psychiatric hospital.

119.     Plaintiff's formal written complaint never alleged any role that a professor played in any civil commitment process.

120.     Plaintiff denied verbally to the Defendant that a hearing was held to have her involuntarily committed to a psychiatric hospital.

29

121.    Plaintiff offered documentation to Defendant proving that no commitment to a hospital occurred, and that no hearing was held.

122.    Defendant knew that its published statement was false.

123.    Defendant did not take any reasonable care to ensure that the false statements were true prior to publication.

123.    Defendant has never made an attempt to correct the aforementioned false statement, even though Plaintiff has continued to protest both informally and formally, inside and outside of the University.

124.    What started as a student's false statements to a sheriff that Plaintiff was dirty and homeless, et al., through Defendant's defamatory actions, became published and widely disseminated statements that Plaintiff was involuntarily committed to a mental hospital.

125.    The statements would reasonably be understood to be an expression which would attack a person's integrity or moral character, expose the person to public hatred, contempt and ridicule, deprive the person of the benefits of public confidence and social dealings, and injure the Plaintiff in the maintenance of her academic career.

126.    Defendant knew that the standard for involuntary commitment to a psychiatric hospital was that the Plaintiff presented a danger to herself or a danger to others, or both.

127.    Defendant knew that it is common knowledge that involuntary commitment to a psychiatric hospital requires that a person be so ill as to be a danger to self, a danger to others, or both.

128.    Mental illness so grave that it results in injury or death to others, has been historically stigmatized, and is therefore a "loathsome disease".

30

129.    Defendant intended to discredit Plaintiff. Defendant showed willful and reckless disregard for Plaintiff's professional reputation in the Ph.D. program. Defendant intended to make conditions at Defendant's institution so intolerable that Plaintiff would withdraw from the University and cease attempting to complete her dissertation, and her Ph.D. program. Defendant intended to bring disrepute to Plaintiff regarding her protected activity of protesting her mistreatment for perceived disability. Defendant did this by knowingly publishing false statements that were consistent with the proposition that Plaintiff was so suffering from mental disease that she was a danger to herself and the community.

130.    Defendant succeeded in its intent.

131.    Plaintiff's reputation in her department became that of a person who had been involuntarily committed to a psychiatric hospital.

132.    Plaintiff reacted to being labeled as suffering from dangerous mental illness by withdrawing from her program until the efforts she made at correcting the situation, utilizing the University's formal procedures, proved fruitful.

133.    Plaintiff, who was not committed involuntarily, or voluntarily, to a psychiatric hospital, was treated as someone who was lying, because of the contradictory statements by the Defendant.

134.    Plaintiff's complaint was not investigated or resolved due to the fact that she was viewed as a person suffering from dangerous mental illness.

135.    Plaintiff is now no longer an active student in the Ph.D. program at Defendant University.

136.    Plaintiff is entitled to nominal damages due to the harm to her reputation.

137.    Plaintiff is entitled to the actual damages of the value of the foregone completion of her educational program.

138.    Plaintiff is entitled to the actual damages due to the harm to her reputation, and her academic and employment careers.

139.    Plaintiff is entitled to the actual damages due to the shame, mortification, and psychological and emotional harm she has suffered due to Defendant's conduct.

140.    Plaintiff is entitled to punitive damages due to the fact that Defendant acted with malice, fraud, and oppression.

141.    Defendant knew of the stigma faced by people who are actually involuntarily committed to a psychiatric hospital, knew that Plaintiff had a right to have her grievance against Defendant's conduct answered, and with this knowledge both intended to injure Plaintiff and disregarded its responsibility to restore Plaintiff from the injury.

142.    Defendant acted with fraud by, among other intentions, misrepresenting Plaintiff as having been subject to a committal hearing, and having been committed to a psychiatric hospital, and concealing the truth of the matter, in order to deprive her of her right to redress for being discriminated against on the basis of a false perception of suffering from a mental impairment.

143.    Defendant was oppressive in its conduct in that, by marking Plaintiff with the scarlet letter of severe insanity, aware of the cruelty they were subjecting Plaintiff to, and aware that Plaintiff had a right to be free of discrimination on the basis of disability, Defendant behaved despicably.

**COUNT 5** – Title IX – Failure to provide prompt and equitable resolution of grievances of sex harassment, termination of student employment, and defamation.

144.    Plaintiff was sexually harassed, stalked, and menaced by a former student of Defendant's University.

145.    Plaintiff sought and received cooperation of the Iowa City Police Department in obtaining a harassment warning, which was conveyed to the former student by Officer Colin Fowler.

146.    The former student, who stalked Plaintiff even after receiving the harassment warning, also participated in providing false affidavits to the police and court of Iowa in an attempt to get Plaintiff involuntarily hospitalized, at which he succeeded.

147.    Plaintiff ended up getting terminated from her teaching position due to the hospitalization, and falsely labeled as having had a commitment hearing, and a subsequent involuntary commitment to a psychiatric hospital as a result of Defendant acting further on the stalking and harassing behavior of the former student.

148.    Defendant's conduct had the effect of allowing the former student to utilize the Defendant in their punitive measures to harm Plaintiff in her education and employment as punishment for not engaging in sexual activity with the former student.

149.    After being terminated from her position, in the May 4, 2010 complaint to Dean of Students Baker, Plaintiff made clear to Defendant that they were acting in the role of punishing enforcer for refusing to engage in sex with the former student. Specifically, Plaintiff wrote: "A statement simultaneously filed with the county by a second individual, Charles Eicher (not a student), included the claim that I had experienced a prior psychiatric hospitalization for manic

depression.  Mr. Eicher presently claims he got this erroneous information from Ms. Hall.

Before the county acted upon Ms. Hall and Mr. Eicher's statements, I had never been

psychiatrically hospitalized.  I also had never, nor have I to this date, been diagnosed with

manic depression. I am not, nor was I judged by hospital psychiatrists, to be at risk of harming

myself or others.


Mr. Eicher is a former friend of mine (never anything more) presently continuing to engage in

harassing conduct toward me (now witnessed on at least two occasions by others).  He was

known by Brittany at the time their statements were filed to have desired a relationship of a

romantic nature with me despite clear attempts on my part to set boundaries that would limit

our relationship to a friendship. (This is a point relevant to the questionability of Brittany's

judgment and motives in seeking his support in asking the county to involuntarily hospitalize

me.)"

150.    In effect, Defendant punished Plaintiff for refusing to have a sexual relationship with a

former student by refusing to investigate or provide prompt and equitable resolution of

Plaintiff's complaint.

151.    In effect, Defendant also punished Plaintiff for refusing to have a sexual relationship

with a former student by maintaining Plaintiff's termination on the basis of a false perception of

disability created by the former student stalker through the wrongful involuntary

hospitalization.

152.    In effect, Defendant further punished Plaintiff for refusing to have a sexual relationship

with a former student by publishing to others a falsehood that Plaintiff was medically deemed

dangerously seriously mentally ill to have been subjected to a hearing to determine what level of involuntary treatment she required, specifically writing:

"Your second allegation asserts that Ms. Hall misrepresented the truth to the hospitalization referee during your committal hearing in December, 2009. Your complaint also accuses Charles Eicher of providing false information and harassing you. Because the committal process is a civil process and not a University process, the Office of the Dean of Students does not intend to investigate what did or did not occur during the committal hearing. Rule 2 of the Code of Student Life does not apply to non-University civil procedures."

153.    As part of her complaint to the Office of Equal Opportunity and Diversity, Plaintiff informed Ms. Stevenson that the initial wrongful hospitalization and subsequent false labeling as seriously mentally impaired by University personnel stemmed from a pattern of conduct of sexual harassment she was grieving.

154.    Defendant, in the person of the Office of the Dean of Students and the Office of Equal Opportunity and Diversity, refused to investigate Plaintiff's claim and in so doing exacerbated the harassment by continuing Plaintiff's status as a victim.

155.    Defendant further injured Plaintiff by maintaining that her termination from her teaching position was not wrongful, by labeling her as (dangerously) seriously mentally impaired, by publishing this false "finding" throughout campus, and by refusing to correct it upon request.

156.    Defendant specifically published the following when describing what occurred in the court and psychiatric hospital interaction:

"Ms. Golliher alleges that Professor Munoz may have played a role in her being involuntarily committed to a psychiatric hospital. Since the committal process is a civil process and not a University process that is within the purview of EOD, EOD did not investigate this allegation."

157.    But for the fact that Plaintiff is a woman and did not engage in a romantic relationship with the former student, Defendant would not have engaged in their punitive conduct directly resulting from a punitive scheme carried out by a former student.

158.    Due to Defendant's conduct, Plaintiff has suffered conditions so intolerable that she has withdrawn from full participation in Defendant's Ph.D. program.

159.    As a result, Plaintiff has suffered damage to her academic career, employment opportunities in the Defendant's University and elsewhere, and emotional injury.

**COUNT 6** – Breach of Contract – Termination of Plaintiff's employment in violation of contract.

160.    This count is a state law complaint of the breach of contract portion of the Hostile Environment element in Count 2 above and incorporates the allegations therein.

161.    Defendant and Plaintiff entered into a contract in which Plaintiff would teach a course for Defendant in exchange for monetary benefits and non-monetary benefits related to academic development, as a Graduate Assistant/Teaching Assistant.

163.    The contract was not for at-will employment, but was governed by a document resulting from collective bargaining called the AGREEMENT BETWEEN BOARD OF REGENTS, STATE OF IOWA AND THE UNITED ELECTRICAL, RADIO AND MACHINE WORKERS OF AMERICA, LOCAL 896/COGS ("The Agreement").

162.    Plaintiff performed the duties assigned her in the terms of the Agreement.

163.    Defendant breached the contract by terminating Plaintiff's position and demanding that she not show up to teach class or administer a final exam.

164.    Plaintiff has suffered damage to her academic career, employment opportunities in the Defendant's University and elsewhere, and emotional injury.


**COUNT 7** – Breach of Contract – Failure to provide prompt and equitable resolution of grievances as according to Plaintiff's contract with the University.

165.    This count is a state law complaint of the failure to provide prompt and equitable resolution of discrimination grievances portion of the Hostile Environment elements in Count 3 (section 504) and Count 5 (Title IX) above and incorporates the allegations therein.

166.    Defendant and Plaintiff entered into a contract by which Defendant would provide educational services to Plaintiff in exchange for tuition fees to Defendant.

167.    A portion of the contract is embodied in Defendant's policies and procedures manuals, including The University of Iowa Operations Manual and the Code of Student Life.

168.    Defendant agreed to provide prompt and equitable resolution to discrimination grievances as part of its contract.

169.    Defendant refused to investigate and provide prompt and equitable resolution to Plaintiff's discrimination grievance brought in 2010.

170.    Plaintiff has suffered damage to her academic career, employment opportunities in the Defendant's University and elsewhere, and emotional injury.


**COUNT 8** – Defamation – Defamation of Plaintiff as "seriously mentally impaired" person.

171.     This count is a state law complaint of defamation portion of the Hostile Environment elements in Count 4 above and incorporates the allegations therein.

172.     Defendant made statements including the language "the hospitalization referee during your committal hearing", "the committal process", "during the committal hearing", and "her being involuntarily committed to a psychiatric hospital".

173.     Defendant published the statements to, among others, Professor Joy Hayes, Professor John Peters, Professor Kristine Munoz, Georgina Dodge, Chief Diversity Officer and Associate Vice President, Jennifer Modestou, Director, Office of Equal Opportunity and Diversity, Tom Rice, Associate Provost for Faculty, Linda Maxson, Dean, College of Liberal Arts & Sciences, Raul Curto, Executive Associate Dean, College of Liberal Arts & Sciences, and Nancy Fick, Senior Human Resources Representative, College of Liberal Arts & Sciences.

174.     Defendant verbally conveyed the same statements to David L. Grady, Associate Vice President for Student Services and Dean of Students.

175.     All persons named in paragraphs 173 and 174 above understood these statements to be about Plaintiff.

176.     The persons named in paragraphs 173 and 174 above understood these statements to mean that an involuntary committal hearing was held for Plaintiff, and that Plaintiff was involuntarily committed to a psychiatric hospital and was therefore a dangerous person, seriously mentally impaired.

177.     Defendant knew, or had reason to know, of the falsity of these statements,  or did not use reasonable care to determine the truth or falsity of these statements.

178.     Plaintiff is entitled to nominal damages.

179.     Plaintiff is entitled to the actual damages due to the harm to her reputation, and her academic and employment careers.

180.     Plaintiff is entitled to the actual damages due to the shame, mortification, and psychological and emotional harm she has suffered due to Defendant's conduct.

181.     Plaintiff is entitled to punitive damages due to the fact that Defendant acted with malice, fraud, and oppression.

**COUNT 9** – Fraud – Misrepresentation the Defendant would provide prompt and equitable resolution of discrimination grievances, and Plaintiff's detrimental reliance on the misrepresentation.

182.     Defendant made statements consistent with the requirement of providing prompt and equitable resolution to those bringing discrimination complaints.

183.     Defendant, on a webpage from the Office of Equal Opportunity and Diversity, which is entitled "Resolving Complaints", <http://www.uiowa.edu/~eod/resolving/index.html>, states that:

> "Any person on campus—faculty, staff, student, or campus visitor—who experiences or perceives discrimination and/or harassment is encouraged to promptly lodge a complaint, either formal or informal. Prompt reporting of complaints is vital to the University's ability to implement its policies."

184.     On Defendant's "Resolving Complaints" webpage, there is a link entitled "Procedures for Discrimination Complaints", http://www.uiowa.edu/~eod/resolving/discrimination.html, which states that:

"The University of Iowa Office of Equal Opportunity and Diversity investigates

complaints of discrimination pursuant to the University's Policy on Human Rights which

provides, in part:

The University of Iowa brings together in common pursuit of its educational goals

persons of many nations, races, and creeds. The University is guided by the precepts

that in no aspect of its programs shall there be differences in the treatment of persons

because of race, creed, color, national origin, age, sex, disability, sexual orientation,

gender identity, or any other classification that deprives the person of consideration as

an individual, and that equal opportunity and access to facilities shall be available to all.

Among the classifications that deprive the person of consideration as an individual are

those based on associational preference."

185.    The "Resolving Complaints" webpage continues with a 796-word description of the

procedures.

In describing the purpose of Defendant's anti-harassment policy, Defendant states that:

The purpose of this policy is to prevent harassment within The University of Iowa

community and to provide a process for addressing all forms of harassment if and when

it does occur. The University of Iowa is committed to maintaining an environment that

recognizes the inherent worth and dignity of every person, and that fosters tolerance,

sensitivity, understanding, and mutual respect. This commitment requires that the

highest value be placed on the use of reason and that any harassment in the University

community be renounced as repugnant and inimical to its goals. Harassment destroys

the mutual trust which binds members of the community in their pursuit of truth.

(The University of Iowa Operations Manual, Part II, Chapter 14, 14.1)

186.    The Defendant's Anti-Harassment Policy continues with a 4,600 word description of procedure for complaints of harassment, available at

<http://www.uiowa.edu/~our/opmanual/ii/14.htm>.

187. Defendant specifically stated that conduct occurring outside of the University is included in the umbrella of prohibited discrimination. Specifically:

"Harassment of any member of the University community is prohibited.

a. Definition of harassment as it relates to conduct. "Harassment" means intentional conduct directed toward an identifiable person or persons that is sufficiently severe, pervasive, or persistent that it interferes with work, educational performance, on-campus living, or participation in a University activity on or off campus.

...

c. Evidence of harassment. Behavior that may constitute, or be evidence of, prohibited harassment includes, but is not limited to, the following:

...

(3) harassment proscribed by the Iowa Criminal Code, Chapter 708, including, for example, stalking, the placement of simulated explosives, ordering merchandise or services with intent to annoy, or false reports to police.

(The University of Iowa Operations Manual, Part II, Chapter 14, 14.2)

and

14.3 SCOPE OF POLICY.

41

a. Acts by employees and students. The University's prohibition of harassment as

defined by II-14.2 above applies to acts of faculty, other instructors, staff, or students

occurring in one or more of the following circumstances:

…

(2) at any location, including through electronic media such as e-mail or social

networking websites, and involving any University faculty, staff, or students, provided

that:

…

(d) The conduct has the purpose or reasonably foreseeable effect of substantially

interfering with the work or educational performance of UI students, faculty, or staff;

(The University of Iowa Operations Manual, Part II, Chapter 14, 14.3)

188. Defendant stated that Plaintiff would be protected from retaliation, specifically stating

that:

14.10 PROTECTION OF ALLEGED VICTIMS, COMPLAINANTS, AND OTHERS.

…

c. Retaliation against alleged victims, complainants, and/or witnesses who provide

information during an investigation pursuant to this policy is prohibited by II-11 Anti-

Retaliation. Reasonable action will be taken to assure that alleged victims,

complainants, and/or witnesses suffer no retaliation as a result of their activities with

regard to the process.

d. Steps that may be taken to protect alleged victims, complainants, witnesses, and

others from continued harassment and/or retaliation might include:

...

(2) arrangement that academic and/or employment evaluations concerning complainants or others be made by an appropriate individual other than the respondent.

189.    The Defendant's statements of prohibition of discrimination and harassment, the statement that complaints will be investigated, the existence of procedures for resolving complaints, and the statement that complaints will be heard regarding harassing conduct that occurs outside of campus were material to Plaintiff's decision to proceed with a discrimination grievance.

190.    That the Defendant will provide prompt and equitable resolution of all complaints of discrimination was false.

191.    The Defendant knew that they would not investigate all complaints of discrimination, and that it would create exceptions that contradict its own statements in policy. Specifically, Defendant wrote, as if they had a concealed predetermination:

"Because the committal process is a civil process and not a University process, the Office of the Dean of Students does not intend to investigate what did or did not occur during the committal hearing."

(May 14, 2010 letter to Plaintiff from the Office of the Dean of Students)

and

"Since the committal process is a civil process and not a University process that is within the purview of EOD, EOD did not investigate this allegation."

(November 29, 2010 Defendant Statement of Findings)

192.    Defendant not only intended that Plaintiff and similarly situated persons act on their statements, but encouraged them to do so, writing:

> "Any person on campus—faculty, staff, student, or campus visitor—who experiences or perceives discrimination and/or harassment is encouraged to promptly lodge a complaint, either formal or informal. Prompt reporting of complaints is vital to the University's ability to implement its policies."
>
> < http://www.uiowa.edu/~eod/resolving/index.html>

193.    Plaintiff had no idea that Defendant's policy regarding discrimination complaints was false, and was reasonable in relying upon it.

194.    Plaintiff suffered damage as a result of relying on Defendant's false statements.

195.    In reliance on the promise of prompt and equitable resolution of the grievance, Plaintiff wasted time on a fruitless and costly course of action in the University of Iowa.

196.    Plaintiff continued to enroll as a nondegree grad student in anticipation that Plaintiff would have some form of redress and would be able to write the dissertation and receive the degree.

197.    Continued enrollment required payment of $2,952.50 in tuition for the Fall of 2010 and Fall of 2011 in order to remain enrolled in the Graduate College in hopes of retaining an advisor.

198.    Plaintiff also suffered opportunity costs of earnings foregone while relying on a return to her academic career.

199.    Plaintiff has also suffered damage to her academic career, employment opportunities in the Defendant's University and elsewhere, and emotional injury.

**PRAYER FOR RELIEF**

Wherefore, Plaintiff requests judgment against defendant, and requests that this court:

Grant Plaintiff equitable relief in the form of an order that Defendant provide for Plaintiff:

1. A letter of apology which will include a retraction of defamatory statements regarding a commitment hearing, and a correction referring to Plaintiff's involuntary hospitalization as wrongful.

2. Removal from Plaintiff's record of teaching evaluations generated after Plaintiff was terminated from the Graduate Assistant/Teaching Assistant position.

3. University permission for Plaintiff to use Professor Dan Douglas of Iowa State University or any other appropriate outside professor as committee chair.

4. Tuition credit for all semesters already paid for doctoral dissertation and continuing registration hours, or a comparable amount in monetary damages.

5. Tuition credit for any coursework required by Plaintiff's interdisciplinary committee beyond coursework already completed.

6. Waiver of time limits for acceptance of Plaintiff's coursework.

7. A promise of not to retaliate for Plaintiff, Plaintiff's committee members, and any department at Iowa that might hire Plaintiff in the future for teaching or office work.

Grant Plaintiff legal relief in the form of:

8. An award to Plaintiff of nominal damages;

9. An award to Plaintiff of compensatory damages, including damages for mental anguish and opportunity costs, totaling $219,730.50, according to proof;

10. An award to Plaintiff of punitive damages, where allowed, according to proof;

11. An award to Plaintiff of attorney fees and costs of this suit;

12. An award to Plaintiff of such other and further relief as this court deems just and proper

5/14/2012

Date

Roberta Golliher, Pro Se

100 Ford Drive, #1

Somerset, KY 42501

(319) 594-3133

RGolliher@yahoo.com